STATE OF NORTH CAROLINA      FILED      IN THE GENERAL COURT OF JUSTICE
                                                        SUPERIOR COURT DIVISION

COUNTY OF CABARRUS                          Civ No: 21 CV 3755

2022 JAN 14 A 9:49

ARTHUR HILL,

        Plaintiff, pro se,

vs.                                        **VERIFIED FIRST AMENDED COMPLAINT**

Carvana, LLC. and
Bridgecrest Credit Company, LLC.

        Defendants.

In accordance with Rule 15(a) of the North Carolina Rules of Civil Procedure and with the consent of the party Defendants, Plaintiff Arthur Hill ("Plaintiff" or "Hill") files this verified first amended complaint and complains of the Defendants Carvana, LLC ("Carvana") and Bridgecrest Credit Company, LLC ("Bridgecrest") (collectively "Defendants") for violations state and federal law and states the following:

## PARTIES

1. Plaintiff is a natural person and at all times relevant to this complaint here was a resident of Cabarrus County in North Carolina.

2. Carvana, a spin-off of Tempe Arizona based DriveTime Automotive Group Inc., is a used car dealership that conducts business in or affecting commerce and does so exclusively via the internet at carvana.com with its principal place of business located at 1930 W. Rio Salado Pkwy Tempe, AZ 85281. Carvana is a "seller" as defined under N.C.G.S. § 25A-6. Carvana is a licensed dealer within this state with locations in Concord, Charlotte, Greensboro and Raleigh.

3. Carvana may be serviced with process by delivering a copy of the summons and complaint to their registered agent, Corporation Service Company, at 2626 Glenwood Avenue Suite 550. Raleigh, NC 27608.

4. Bridgecrest is an affiliate of Carvana by common ownership, incorporated under the laws of Arizona and generally services retail installment contracts entered into by Carvana with consumers. Bridgecrest is also a "seller" as defined under N.C.G.S. § 25A-6 to the extent that it involves events arising after assignment to receive payments on behalf of Carvana. Bridgecrest's business is in or affecting commerce in this state.

5. Bridgecrest may be serviced with process by delivering a copy of the summons and complaint to their registered agent, Corporation Service Company, at 2626 Glenwood Avenue

1

Suite 550. Raleigh, NC 27608.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over civil cases involving amounts over $25,000.

7. Venue is proper because Plaintiff resides in Cabarrus County, Carvana conducts business in and maintains a registered agent in this state and Bridgecrest maintains a registered agent in this state and services installment contracts for residents in this state.

## STATEMENT OF FACTS

8. On August 15, 2019, Plaintiff entered into a retail installment contract with Carvana to pay for a 2016 BMW 3 ("BMW") he purchased at a sale price of $23,900. The BMW was delivered on August 17, 2019 at Carvana's South Blvd location in Charlotte, NC. A copy of the Retail Purchase Agreement ("Purchase Agreement") and Retail Installment Contract and Security Agreement ("Contract") that Plaintiff purportedly signed via DocuSign are attached hereto as "Exhibit 1" and "Exhibit 2" respectively. An Arbitration Agreement that was also provided on August 17, 2019 and purportedly signed by the Plaintiff was opted out of on August 21, 2019. All 3 of the forementioned documents were purportedly signed electronically via the internet on August 15, 2019. The documents were provided to the Plaintiff on August 17, 2019 upon vehicle delivery. The documents bear a signature date of August 17, 2019 even though the documents that Plaintiff signed should have a signature date of August 15, 2019.

9. During delivery of the BMW on August 17, 2019, Carvana did not provide the Plaintiff with any documents evidencing a registration plate transfer was to take place or a title application. Plaintiff was provided a copy of (1) Retail Purchase Agreement, (2) Retail Installment Contract and Security Agreement, (3) Arbitration Agreement, (4) Odometer Disclosure, (5) Carvana Limited Warranty, (6) Credit Reporting Notice, (7) a certification that Plaintiff was not filing for Bankruptcy and (8) Buyers Guide. Each of these documents were purportly signed by the Plaintiff using DocuSign.

10. On the morning of August 17, 2019 at approximately 3:34AM EST, Carvana sent Plaintiff an email containing a link to a document online which was a risk-based pricing notice as defined under the 12 CFR Part 1022 (Regulation V). The file name from the link download was "riskbasedpricing-9662775.pdf". The document indicates that Carvana requested and received a credit score about the Plaintiff regarding risk-based pricing notice the evening of August 15, 2019 at approximately 7:26PM.

11. On the morning of August 19, 2019 at approximately 4:38AM EST, Carvana sent Plaintiff another email containing a link to a document online which was a risk-based pricing notice as defined under the 12 CFR Part 1022 (Regulation V). The file name from the link download was "riskbasedpricing-9662775.pdf". The document indicates that Carvana requested and received a credit score about the Plaintiff regarding risk-based pricing notice the night of August 17, 2019 at approximately 11:19PM.

2

12.     On information and belief, a risk-based pricing notice was due prior to consummation of the transaction on August 15, 2019 instead of 2 days later on August 17, 2019 or 2 days after delivery on August 19, 2019.  Carvana, on information and belief, was in violation of the timing provision for providing a risk-based pricing notice so they changed the dates on the documents the Plaintiff signed to create the appearance that the transaction was consummated in person on August 17, 2019.  Plaintiff discovered this violation between August 17 and August 21 of 2019 but after researching the law, he determined he could not assert a cause of action for any violation because a risk-based pricing violation can't be privately enforced.  Plaintiff then opted out of an arbitration agreement he signed in the event Carvana had violated other laws so that he rights would not be limited.

13.     On information and belief, Carvana and Bridgecrest have servicing agreements whereby Bridgecrest is not explicitly assigned in the Contract but they are pre-designated as the servicer of the Contract through separate agreements.  *See* Exhibit 2, page 5 of 5 showing no assignment.

14.     As part of the BMW purchase, Plaintiff put $10,000 cash down and was credited $200 for trade-in of a 2005 Suzuki XL-7.  The TILA disclosures provided for **a)** amount financed of $14,515, **b)** for a term of 72 months, **c)** 3.90% APR and **d)** finance charge over the term of $1,783.23.  The monthly payment for the first 71 months was fixed at $227 and a final payment of $181.23 for month 72.  Per the Contract, if the Plaintiff paid off the Contract early, he would not have to pay a penalty.

15.     Plaintiff's first payment was due and paid on September 17, 2019 and scheduled payments of $227 were made up to and including September 17, 2021 for a total of $5,675.

16.     On September 22, 2021, Plaintiff logged into his profile with Bridgecrest at bridgecrest.com and requested a payoff quote which returned an amount of $9,845.62.  Plaintiff then submitted a payment for that amount on the same day at bridgecrest.com.  On the following day, when Plaintiff logged into bridecrest.com, the site indicated there was no longer an account for the Plaintiff because the account had been paid in full.  The total amount paid in finance charges as of the date of payoff was $1,005.62 which represents 56% of the total finance charges with 47 of the 72 months still remaining in the original term.

17.     On information and belief, on or around August 2, 2021, Carvana was banned from conducting business in Wake County until January 2022 for, among other things, issuing out-of-state temporary tags/plates for a vehicle sold to a person in NC and offering vehicles for sale without state inspections.

18.     On October 13, 2021, after researching the reasons for Carvana being banned in Wake County, Plaintiff sought to determine if there were issues involving a Temporary Plate Fee that Carvana charged the Plaintiff.  Plaintiff researched communications at that time of purchased and found an email he sent to registration@carvana.com of which he had attached the registration for his trade-in vehicle in order to have his plates transferred to the newly purchased BMW.  *See* email which includes a response from Carvana attached hereto as "**Exhibit 3**".  A copy of the registration for the trade-in is also attached hereto as "**Exhibit 4**".

3

19. Based on the response from Carvana regarding the preceding paragraph, Plaintiff was informed that "*At the time of delivery, you will receive a temporary operating plate which you will have to keep on your vehicle until you receive the updated paper registration in the mail.*". *See* Exhibit 3.

20. Plaintiff was not provided any temporary plate at the time of delivery because the plate from his trade-in was transferred to the BMW. Instead, Plaintiff was informed that a 30-DAY TEMPORARY MARKER RECEIPT ("30-day marker receipt") was placed in the glove box of the BMW and should remain there until he received his updated registration which should then list the BMW with the same tag number as the trade-in. That if he happened to be stopped and was asked for the registration, that he should provide the 30-day marker receipt document as evidence of registration. Plaintiff never had a need to refer to or use the 30-day marker receipt as proof of registration.

21. On information and belief, the assertions made by Carvana in the preceding two (2) paragraphs were misleading and false. Upon recovering and inspecting the 30-day marker receipt from the BMW glove box, Plaintiff observed it was not fully completed or signed and it left the following items blank: **a)** Name of company affording liability insurance, **b)** Policy number, **c)** Title and License Fees Collected by Dealer $, **d)** Check Plate Classification and **e)** By (certifying signature). Item **e)** was preceded by "I, the undersigned, do hereby certify that the rules and regulations governing the issuance of 30-day Temporary Markers have been fully complied with.". As can be observed, no one signed the receipt. Furthermore, the 30-day marker receipt stated at the bottom that "This copy must be given to purchaser with corresponding 30-day temporary marker.". *See* 30-day marker receipt attached hereto as "**Exhibit 5**". Likewise, On September 5, 2019, Carvana sent an email to the Plaintiff with the following message suggesting the Plaintiff would be receiving new plates even when they knew the Plaintiff's plates were being transferred:

> *"We've got great news! Your registration for your 2016 BMW 3 Series has been processed! You should receive your plates within 5-7 business days. If you do not receive your plates within this time period, please reach out to our Customer Advocate team at 1.844.507.3599."*

22. On October 13, 2021, when Plaintiff retrieved the 30-day temporary marker from the glove box of the BMW, he also found a state inspection receipt and statement showing an inspection took place on August 17, 2019, the day the Plaintiff would pick up the BMW. On information and belief, the BMW should have been inspected prior to being offered for sale on August 15, 2019. See G.S. § 20-183.4C(2) which states: "A used vehicle must be inspected before it is offered for sale at retail in this State by a dealer. Upon purchase, a receipt approved by the Division must be provided to the new owner certifying compliance.". A violation of this statute was part of the reason Carvana's dealer license was suspended in Wake County as part of Superior Court case no. 21 CVS 8116.

23. Upon researching the law regarding the issuance of temporary markers in the state, Plaintiff learned that under the circumstances, a dealer such as Carvana could not issue a temporary plate when a registration plate was being transferred. Furthermore, a receipt should be accompanied by a temporary marker to be attached to the vehicle until a new or replacement plate

4

was received. As mentioned, Plaintiff already had a registration plate which was transferred from his trade-in, a 2005 Suzuki XL-7 to the BMW.

24. On October 13, 2021, after making the discovery regarding the 30-day marker receipt and the law regarding issuance by a dealer, Plaintiff filed a complaint with the License and Theft Bureau of the North Carolina Division of Motor Vehicles ("Theft Bureau"), informing them that he was charged for a Temporary plate that he didn't believe should have been charged because his plates were transferred and further that he never received a temporary plate. Plaintiff was called within one hour of submitting the complaint by a lieutenant of the Theft Bureau who requested that Plaintiff send her a copy of the document showing the line item where he was charged a temporary plate fee. Plaintiff immediately sent a copy of page 1 from the Purchase agreement along with emails between Plaintiff and Carvana regarding the plate transfer. *See* page 1 of Exhibit 1 at line item 3b. Plaintiff also emailed a copy of the 30-day temporary marker seen in Exhibit 5.

25. Realizing the Temporary Plate fee may not be valid, Plaintiff looked into whether other fees he was charged by Carvana could be unlawful or potentially overstated. On information and belief, as can be seen on Exhibit 1, the following, including the temporary plate fee, were charged but were either over-charged or bogus with suspected reasons:

| Line Item | Charged | Overage | Reason |
| --- | --- | --- | --- |
| 3a - NC Registration Fee | 36.00 | (16.00) | Over charge: due to registration transfer. Should be a registration transfer fee of $20.00 |
| 3b - Temporary Plate Fee | 1.00 | (1.00) | Unlawful: Not valid with registration transfer |
| 3c - County Registration Fee | 15.00 | (15.00) | Unlawful: Not valid with registration transfer |

Plaintiff renewed registration for his trade-in vehicle on October 31, 2018 and paid a $36.00 annual registration renewal fee at that time so line item 3a was not due again until October 31, 2019. Line item 3a – NC Registration Fee, based on fee schedule, should be a Registration Transfer Fee and equal to $20.00 since this involved a plate/registration transfer and was not a renewal given there was still time remaining on the pre-existing registration being transferred. The registration Plaintiff did receive for the BMW expired on October 31, 2019 as expected. Plaintiff renewed registration again on October 18, 2019 and paid a $36.00 annual registration renewal fee, less than 2 months after he was charged $36.00 by Carvana.

26. As a licensed dealer in this State, Carvana knew and understood the laws and regulations regarding the collection of fees or other amounts that were due to the state or local government but ignored those laws or regulations. N.C.G.S. § 105-330.6 (b) states:

> *"Transfer of Plates. – If the owner of a classified motor vehicle listed pursuant to G.S. 105-330.3(a)(1) transfers the registration plates from the listed vehicle to another classified motor vehicle pursuant to G.S. 20-64 during the listed vehicle's tax year, the vehicle to which the plates are transferred is not required to be listed or taxed until the current registration expires or is renewed"*

27. Although the law is clear and Carvana knew the Plaintiff's plates were being

5

transferred, they still charged the Plaintiff a County Registration Fee of $15.00 even though Plaintiff had already paid this same fee when he renewed his registration in October of 2018. *See* 2018 renewal receipt attached hereto "**Exhibit 6**". On information and belief, this $15 fee is a vehicle property tax charged annually with registration renewals.

28. Although the law is also clear regarding when a dealer can issue a temporary marker, Carvana still charged the Plaintiff a Temporary Plate fee even when they knew that no temporary plate was provided and they knew it was forbidden by law. 19A N.C. Admin. Code 3D.0221(b)(6) states in relevant part that "… If a plate is to be transferred, a 30-day temporary marker shall not be issued.". As mentioned, Carvana merely tucked a partially completed 30-temporary marker receipt in the Plaintiff's glove box and asked that he only use it if he was stopped and asked to show registration for the BMW.

29. Carvana could be penalized through an enforcement action if they improperly issued a 30-day temporary marker. *See* 19A N.C. Admin. Code 3D.0235 which states in relevant part that: "The Division of Motor Vehicles shall apply the Civil Penalty Schedule for Type II Violations against a licensed automobile dealer for any of the following: . . . (5) Improperly issuing or using 30-day temporary markers as addressed in G.S. 20-79.1".

30. Considering Carvana knew that Plaintiff's license plate from his trade-in was being transferred, they knew that the cost for registration transfer was not $36.00 as charged. Yet they still charged the Plaintiff that amount instead of the registration transfer amount per the DMV fee schedule for 2019 which should have been $20.00. *See* fee changes found at https://www.ncdot.gov/news/press-releases/Documents/2020-06-29-dmv-fees-increasing.pdf. *See* Exhibit 6 showing the Plaintiff paid a registration renewal fee of $36.00 on October 31, 2018 which would not expire or come due again until October 31, 2019. Also *see* receipt attached hereto as "**Exhibit 7**" showing the Plaintiff paid another registration renewal fee of $36.00 on October 18, 2019, two months after the BMW purchase.

31. As a result of Carvana either charging unlawful fees which were not due by law or for over charging the Plaintiff using a different purpose fee such as using a registration renewal fee instead of a registration transfer fee, Plaintiff paid additional amounts in finance charges on top of the unlawful fees under the Contract. Plaintiff had no reason to suspect that any of the fees charged regarding registration or plates were unlawful.

32. Carvana could be penalized through an enforcement action for their wrongful actions. *See* N.C.G.S. § 20-294 which states in relevant part that "The Division may deny, suspend, place on probation, or revoke a license issued under this Article for any one or more of the following grounds: . . . (14) Willfully defrauding any retail buyer, to the buyer's damage, or any other person in the conduct of the licensee's business. ... (16) Using unfair methods of competition or unfair deceptive acts or practices as addressed in G.S. 20-294(6)". Also *see* 19A N.C. Admin. Code 3D.0234. See also Wake County Superior Court case no. 21 CVS 8116.

33. The Plaintiff was purposely mislead and deceived by Carvana regarding the official fees. None of the three fees mentioned were sent to the DMV for the stated purpose. Instead, Carvana took those fees for themselves under the pretense that they would be paid to the DMV.

In doing so, Carvana misrepresented the amount financed, the finance charge and the APR.

34. In order to conceal their deception, Carvana removed the receipt portion of the registration prior to mailing it to the Plaintiff. The receipt would have shown that Carvana paid $20 Transfer Plate Fee to the DMV, a fee which was not disclosed on the Sales Agreement or Contract. It would have also revealed that Carvana did NOT pay a $36 Registration Fee or $15 County Registration Fee to the DMV. In an apparent attempt to escape or otherwise avoid liability for this deception after the fact, Carvana sent the Plaintiff a check for $31 on December 1, 2021, the day in which their answer was due to the original complaint. However, Plaintiff rejected and sent the check back to Carvana by certified mail.

**FACTS REGARDING REQUEST FOR STATEMENT OF ACCOUNT AND REBATE**

35. On October 14, 2021 at approximately 7:56AM EST, the Plaintiff logged into bridgecrest.com and sent the following message to Bridgecrest:

> "This is a formal written request that you provide a statement of account in accordance with North Carolina General Statute § 25A-35. This is regarding the retail installment contract for VIN # WBA8E9G54GNT46394.
>
> Please include an accounting of any earned and unearned finance charges that were paid."

36. Additionally, on October 14, 2021 at approximately 8:14AM EST, the Plaintiff logged into bridgecrest.com and using the [Contact Us] feature of Bridgecrest's website and sent the following message to Bridgecrest:

> "Regarding the installment contract involving VIN # WBA8E9G54GNT46394, please accept this as a formal written demand for refund or rebate of any 1) unearned amounts of finance charges due to prepayment of the installment contract prior to its maturity and 2) refund of any amounts that were included on page 1 of the Retail Purchase Agreement (3a through 3c) if those amounts were not valid official fees for the state, not required for the transaction or that were required but the amount was in excess of the amount required.
> As for item 2) above, please include any finance charges that were paid on those amounts.
>
> Item 1) above is made in accordance with North Carolina General Statute § 25A-32."

37. As of the filing of this Complaint, Plaintiff had not received any statement of account in accordance with N.C.G.S. § 25A-35 from Bridgecrest or Carvana.

38. As of the filing of this Complaint, Plaintiff had not received any rebate as demanded in

7

accordance with N.C.G.S. § 25A-32. On information and belief, Plaintiff believes the rebate due to him using the rule of 78 would come out to $764.98 provided the rebate was provided as requested within a 10-day period but it was not provided within that time frame.

## FACTS REGARDING DOCUMENTS ALLGEDY SIGNED BY THE PLAINTIFF

39. DocuSign, Inc ("DocuSign") is a company used to electronically sign documents in compliance with the U.S. Electronic Signatures in Global and National Commerce Act (ESIGN), 15 U.S.C. § 7001 et seq. Under ESIGN, electronic records and signatures in compliance with ESIGN are legally binding. DocuSign permits a company to send documents to a customer for their signature. The customer opens the document for review containing areas marked for the signatory to execute. The signer creates a signature and must click a button confirming their signature once they have completed all form fields and signed in all required places.

40. DocuSign also provides a set of Application Programming Interfaces ("API") that can be used to programmatically interact with their e-signature services in addition to DocuSign PowerForms which allow clients to use DocuSign document e-signature products from their own website instead of a DocuSign website.

41. DocuSign generally allows its clients to request a signature by sending an email to the user or customer on behalf of the client. The email recipient would then click a "View Document" button or link in the email which takes them to the DocuSign website. The email may also contain a unique security code that could be used before being provided access to the documents and signing. From the website, the user would create a signature and initials by selecting a pre-defined style or drawing their own. That signature or initial would then be used to sign or initial one or more documents in pre-designated areas marked for execution using a click. Once each pre-designated area for a signature or initial has been executed, the user can click "Finish" to complete the document signing process. If there are other signatories, DocuSign generally sends the signed documents to the next signatories email address based on the sequence defined by the client. All signatures or initials on the signed documents for a given user would be identical. The user could also a) print documents, b) view, print or download a Certificate of Completion or c) view, print or download history of the envelope if desired or d) revoke a document if not already signed. In this case, Carvana sent a custom email which makes no mention of DocuSign and directed the Plaintiff to a website location at carvana.com which may use DocuSign PowerForms or DocuSign's API. Within the email, Carvana advised Plaintiff he did do not need to print the documents.

42. A DocuSign Certificate of Completion provides identifying information about the envelope and complete details of the envelope events. The signer events section provides details about each signer of the document, including the signer's IP address and other identifying information, a signature image and key event timestamps. In its native PDF form, the Certificate of Completion include a digital signature embedded by DocuSign. This digital signature serves as a non-repudiation tamper stamp which among other things, is used to verify a document has not been modified since the digital signature was applied. If alterations are made to a digitally signed document, the digital signature will provide details about where alterations were made and depending on the document PDF viewing software being used, would also allow someone to view

the originally signed document without the alterations.

43. Carvana has required documents to be signed electronically using DocuSign's e-signature product offerings since no later than 2017.

44. Although DocuSign has security features to help verify the signature of the person who signs or initials a document, Carvana avoids use of those security features. For example, DocuSign has a security feature for the signature that, once signed, the term "DocuSigned By:" appears above the signature and a 15-digit alphanumeric characters appear below the signature as a unique signature id. Additionally, for initials, the letters "DS" would appear above the initials. Examples of both are seen in Figure 1 below using one of the pre-defined styles provided by DocuSign.



Figure 1 - Sample DocuSign signatures available for selection

45. Although DocuSign has features to notify users when a document has been signed and provide copies of the signed documents automatically, Carvana did not use of those features in as far as providing copies to the Plaintiff. As mentioned, Carvana also advised the Plaintiff he didn't need to print the documents in an email.

46. DocuSign also provides a field that allows Carvana to capture the date a document was signed which is populated automatically when a user clicks a pre-designated area to sign using the signature that he/she created. However, in this case, Carvana avoided use of this feature and instead, placed a future date where a date of signature should appear creating the appearance that the Plaintiff electronically signed and dated documents on August 17, 2019 instead of August 15, 2019. G.S. § 25A-28 requires that a document be dated and signed by the buyer. The use of an auto-populated date field could have sufficed for a Plaintiff's signature date if it had been implemented as it would have reflected the actual date or the actual date and time of the Plaintiff, but that was not the case.

47. All of the signatures on the documents that were provided to the Plaintiff and appear to be Plaintiff's signature look strikingly similar to the Plaintiff's actual signatures. But in the case of the Contract and the Sales Agreement that were provided to the Plaintiff, the signatures and initials that appear on the documents couldn't have been made by the Plaintiff because, upon closer inspection, the signatures are different, even within the same document. If the signatures appearing on documents provided to the Plaintiff were made by the Plaintiff, they would be identical across all of the documents.

48. Plaintiff did not sign any document position that required a signature using his signature plus his initials ("Signature+Initials") as seen twice on page 5 of the Contract in Exhibit 2 and once on page 1 of the Sales Agreement in Exhibit 1.

49. Plaintiff did not sign any document position that required an initial using his signature

as seen on the bottom right corner of every page of the Contract as seen in Exhibit 2. Likewise, Plaintiff did not sign any document position that required an initial with Signature+Initials as seen on page 1 of the Sales Agreement as seen in Exhibit 1.

50. On information and belief, both the Contract and Sales Agreement that were provided to the Plaintiff on August 17, 2019 are not documents that Plaintiff electronically signed on August 15, 2019. The documents are instead good forgeries which had what appears to be different versions of signatures from the Plaintiff. In particular, the Sales Agreement, Exhibit 1, has two different sets of Signature+Initials, one where "Buyer's Initials" should appear and a different one where Plaintiff's signature should appear as demonstrated in Figure 2 and 3 below.



Figure 2 – Version 1 – Signature+Initials on Sales Agreement where initials are expected



Figure 3 - Version 2 – Signature+Initials on Sales Agreement where signature is expected

The Contract, Exhibit 2, has a signature plus initials while the signature appearing on the bottom right corner of every page is not the same as the signature that appears with initials. A signature from the Plaintiff would not change during a signing session between separate documents and certainly not on the same document.



Figure 4 - Version 1 – Signature+Initials on page 5 of Contact where signature is expected



Figure 5 - Version 2 - Signature on bottom of all Contract pages where initials are expected

51. There are at least three (3) distinctly different signatures across the Contract and the Sales Agreement. The signature seen above in Figure 2 is different from the signatures seen above in Figure 3, 4 & 5. The signatures seen above in Figure 3 & 4 are the same but different from the signature seen above in Figure 5. And the signature seen above in Figure 5 is different from the signatures seen above in Figure 2, 3 & 4.

52. Whomever created the signatures seen above in Figure 2 and 5 did a good job at creating nearly indistinguishable versions of the Plaintiff's signature. The Plaintiff signed documents in a single session on August 15, 2019 and there should only be one unique signature, regardless of the number of signatures, across all of the documents if signed by the Plaintiff using DocuSign.

53. Although the Plaintiff had the Contract and Sales Agreement in his possession for over two years, reviewed the documents between August 15 and August 21 of 2019 after the transaction, reviewed the documents again prior to filing suit and attached both documents to his original complaint as Exhibits, he never suspected or had any reason to suspect any of the signatures could be forgeries because they looked like his signatures.

54. Although the Plaintiff filed a different lawsuit against Carvana and that case was removed from this Court's District division and amended at least once in federal court, Plaintiff still never suspected or had any reason to suspect any of the signatures could be forgeries because they looked like his signatures. As such, Plaintiff made no allegations regarding forgery in his original or amended complaint that is now pending in federal court.

55. Plaintiff didn't focus any attention to any signatures until he reviewed documents filed by Carvana in *Saddler v. Carvana, LLC*, CASE NO 4:20CV105 HEA (E.D. Mo. Aug. 11, 2020). A declaration in that case revealed that Carvana used DocuSign. Consistent with how DocuSign works, the signed documents filed in that case show the exact same signature in places requiring a signature and the same initials in places requiring initials. The Certificate of Completion filed in that case also show the signature image associated with the Plaintiff in *Saddler* matched the signature on each document that was allegedly signed by him. Notably, the Sales Agreement in that case does not have any initials or signatures in the bottom right corner of each page.

56. Plaintiff also didn't recognize there should be no differences in signatures on a document until he learned that Carvana had used DocuSign since 2017 based on researching the *Saddler* case and conducting his own investigation of the DocuSign e-signature software.

57. Plaintiff never would have made any payments, cancelled the Contract with Carvana and demanded a full refund if he had known, among other things, that his signature had been forged on documents that were given to him on August 17, 2019. Furthermore, Plaintiff would have likely reported the forgeries at the time to authorities like the North Carolina Attorney General and/or the Consumer Finance Protection Bureau.

58. The documents that were provided to the Plaintiff on August 17, 2019 appear as though someone recreated the originals or created new documents for some unknown reason. It appears as though someone then signed the new documents using a new signature but the signature was created with initials appended to the end. It then appears as if someone added additional areas for signatures or initials to the documents, created yet another signature and/or initials and then used that signature or initials on certain areas of new or revised documents.

59. Carvana never contacted Plaintiff to ask him to sign or re-sign any additional, revised or new documents after he signed documents on August 15, 2019.

60. Carvana, having knowledge of when the Plaintiff actually signed documents and having discreet knowledge of the DocuSign Certificates of Completion, Envelope history and audit trails, knew at all times that the documents provided to the Plaintiff had been altered and were not the original documents the Plaintiff had signed on August 15, 2019.

61. On information and belief, of the individuals at Carvana who knew or should have known that the documents were forged is Paul Breaux, the General Counsel at Carvana who himself signed one or more of the documents in question.

62. Under North Carolina law, a person may be charged with a felony for forging a document with the intent to injure or defraud a person. They may also be charged with a felony for uttering any false or forged document in accordance with N.C. Gen. Stat. § §14-119-120. They may be charged with a felony whether they uttered a false or forged document directly or indirectly.

63. On information and belief, discovery would reveal that an employee or agent of Carvana forged the Plaintiff's signature on versions of the Contract and Sales Agreement that were provided to the Plaintiff on August 17, 2019.

64. On information and belief, discovery may also reveal that Carvana made material changes regarding terms between what Plaintiff actually signed on August 15, 2019 and the documents he was provided on August 17, 2019. For example, the APR may have been increased from the original documents or the official fees that Plaintiff alleged were the result of fraud may not have been present on the documents he signed. There is no reasonable basis for Carvana to forge documents unless material changes were made between the original and the forged versions.

65. Due to Carvana forging one of more signatures of the Plaintiff on the Contract, the Sales Agreement and possibly other documents, all of which are considered felonies under the laws of this state, the Contract was voidable and Plaintiff would have sought rescission if he had knowledge of, among other things, the forgeries at the time the documents were provided to him or before he paid off the BMW.

## CLAIMS FOR RELIEF

### COUNT 1
### FRAUD AGAINST CARVANA

66. The preceding paragraphs are incorporated here as though stated word for word.

67. Carvana has engaged in a common scheme of fraud, through which they unlawfully charged official fees that were not due and collected interest on those unlawful fees.

68. Carvana has also engaged in a common scheme of fraud, through which they seamlessly and convincingly forged signatures of the Plaintiff onto documents without consent or knowledge of the Plaintiff.

69. Carvana intentionally perpetrated the common scheme of fraud complained of herein as an unlawful means to cause Plaintiff to pay additional fees, additional finance charges and avoid cancelling a voidable contract.

70. Plaintiff justifiably relied on the Carvana's failures to disclose both their scheme of

12

unlawfully charging additional fees and forgery of his signature on one or more documents.

71. As mentioned herein, Carvana made false representations or concealed material facts involving the following:

   a. Falsely representing that the Plaintiff required a temporary plate when no plate was provided or authorized to be issued by law due to a registration plate transfer;

   b. Falsely representing that the Plaintiff was required to pay a fee for a temporary plate when no plate was provided or authorized to be issued by law due to a registration plate transfer;

   c. Falsely representing that the Plaintiff was required to pay a County Registration fee which was not warranted by law due to a registration plate transfer and existing registration that would not expire until a future date;

   d. Falsely representing that the Plaintiff was required to pay the costs of a registration renewal when there was a registration plate transfer.

   e. Falsely representing that the Plaintiff could use a partially completed and unsigned 30-day temporary marker receipt as proof of registration if stopped by law enforcement.

   f. Falsely representing that they were offering the BMW for sale in compliance with the law when they knew the requirement for an inspection prior to offering the vehicle for sale had not been met on August 15, 2019 considering they did not have the vehicle inspected until after the Plaintiff arrived to pick up the vehicle.

   g. Forging the Plaintiff's signature on one or more documents without his knowledge or permission, passing those forged documents to the Plaintiff and falsely representing that the documents provided to the Plaintiff were true, accurate and authentic copies of documents the Plaintiff had signed electronically on August 15, 2019.

72. The misrepresentations or concealment of material facts by Carvana were reasonably calculated to deceive, made with the intent to deceive and did in fact deceive the Plaintiff resulting in damage.

73. As a direct and proximate result of Carvana's common fraud scheme, Plaintiff was caused and sustained damages in the form of the unauthorized fees paid in connection with the purchase of a motor vehicle and denied an opportunity to avoid a voidable Contract. As a result, Carvana is liable to the Plaintiff for compensatory and punitive damages to be determined by a trier of fact.

## COUNT 2
## VIOLATION OF RETAIL INSTALLMENT SALES ACT ("RISA")
## AGAINST CARVANA AND BRIDGECREST

74. The preceding paragraphs are incorporated here as though stated word for word.

75. N.C.G.S. § 25A-35 states that in relevant part that:

(a) One time during each 12-month period following execution of a consumer credit installment sale contract and when the buyer repays the debt early, the buyer shall be entitled upon request and without charge to a statement of account from the seller. The statement of account shall contain the following information identified as such in the statement:

(1) The itemized amounts paid by or on behalf of the buyer to the date of the statement of account, except that upon early termination of the contract by prepayment or otherwise, the statement shall include itemized charges for expenses of repossession, storage and legal expenses.

76. As mentioned above, Plaintiff had not received a response from Defendants regarding a statement of account.

77. N.C.G.S. § 25A-32 states in relevant part that:

Notwithstanding any provision in a consumer credit installment sale contract to the contrary, any buyer may satisfy the debt in full at any time before maturity, and in so satisfying such debt, shall receive a rebate, the amount of which shall be computed under the "rule of 78's," as follows:

The amount of such rebate shall represent as great a proportion of the finance charge (less a prepayment charge of ten percent (10%) of the unpaid balance, not to exceed twenty-five dollars ($25.00)) as the sum of the periodical time balances after the date of prepayment in full bears to the sum of all the periodical time balances under the schedule of payments in the original contract." No rebate is required if the amount thereof is less than one dollar ($1.00).

If the prepayment is made otherwise than on the due date of an installment, it shall be deemed to have been made on the installment due date nearest in time to the actual date of payment.

78. As mentioned above, Plaintiff had not received a response from the Defendants regarding a rebate or refund.

79. N.C.G.S. § 25A-44 states in relevant part that:

14

> In addition to remedies hereinbefore provided, the following remedies shall apply to consumer credit sales:
>
> . . .
>
> > (3) In the event the seller or an assignee of the seller (i) shall fail to make any rebate required by G.S. 25A-32 or G.S. 25A-36, (ii) shall charge and receive fees or charges in excess of those specifically authorized by this Chapter, or (iii) shall charge and receive sums not authorized by this Chapter, the buyer shall be entitled to demand and receive the rebate due and excessive or unauthorized charges. Ten days after receiving written request therefor, the seller shall be liable to the buyer for an amount equal to three times the sum of any rebate due and all improper charges which have not been rebated or refunded within the 10-day period.
> >
> > (4) The knowing and willful violation of any provision of this Chapter shall constitute an unfair trade practice under G.S. 75-1.1.

80. The actions or inactions of Defendants regarding a statement of account and rebate were knowing and willful making them liable to the Plaintiff for three times the sum of any rebate due and all improper charges which have not been rebated or refunded within the 10-day period of Plaintiff's demand.

81. As a result of Defendants actions or inactions, they are in violation of RISA and liable to the Plaintiff for damages pursuant to N.C.G.S. § 25A-44(4) to be determined by a trier of fact. Plaintiff is due three times the amount of rebate or refund along with any unauthorized charges.

## COUNT 3
## VIOLATION OF NCUDTPA AGAINST CARVANA AND BRIDGECREST

82. The preceding paragraphs are incorporated here as though stated word for word.

83. Pursuant to N.C.G.S. § 75-1.1, unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

84. As mentioned herein and in COUNT 1 and COUNT 2, Defendants engaged in acts which were unfair or deceptive and those acts or practices were in or affecting commerce. Fraud has long been recognized as an unfair and deceptive practice. Likewise, N.C.G.S. § 25A-44(4) states that "The knowing and willful violation of any provision of this Chapter shall constitute an unfair trade practice under G.S. 75-1.1".

85. As mentioned above, Carvana also violated the risk-based pricing timing disclosure which, if prosecuted by the proper authority, could amount to an unfair or deceptive practice under federal law although no such cause of action is made here and Plaintiff would not have standing to state such a claim in this instance.

86. As mentioned herein, Carvana offered the BMW for sale with knowledge that there had not been a state inspection in violation of § 20-183.4C(2).

87. As mentioned herein, Carvana forged the Plaintiff's signature on one of more documents as part of a common scheme of fraud and deceptive acts or practices.

88. As a result of Defendants actions or inactions involving their unfair or deceptive acts or practices, they are liable to the Plaintiff for treble damages pursuant to N.C.G.S. § 75-16.

## COUNT 4
## VIOLATION OF THE TRUTH IN LENDING ACT ("TILA")

89. The preceding paragraphs are incorporated here as though stated word for word.

90. TILA requires written disclosures in a form that the Plaintiff could keep be provided prior to the consummation of the transaction at issue in this case. In this case, Carvana did not provide any disclosures until 2 days after Plaintiff had signed agreements online consummating the transaction and even then, the documents were not the documents the Plaintiff signed.

91. Carvana did not provide a statement of Plaintiff's right to obtain, upon a written request, a written itemization of the amount financed in accordance with 15 U.S.C. § 1638(a)(2)(B). This was so prior to and after consummation of the transaction.

92. As alleged herein, Carvana failed to disclose there was a $20 Plate Transfer Fee which they knew was due from the Plaintiff and actually paid to the DMV.

93. As alleged herein, Carvana disclosed but materially misrepresented that Plaintiff owed certain official fees that were part of the transaction including a $36 Registration Fee, $15 County Registration Fee and $1 Temporary Plate Fee. These fees were collected but not paid to the DMV or other government or state body for their intended purposes.

94. Carvana fraudulently concealed their mispresentations by withholding documents that would have revealed that they had not paid certain fees that were disclosed and paid another undisclosed fee. In this case, Carvana removed the receipt from the vehicle registration prior to sending it to the Plaintiff, effectively concealing which fees were paid or not paid.

95. As a result of Carvana not disclosing a $20 Plate Transfer Fee that was due and paid to the DMV while at the same time disclosing, collecting and pocketing fees that were not due to the DMV, Carvana collected additional amounts as a finance charge. And as a result of collection additional amounts which were not due and should not have been part of the amount financed, Carvana misrepresented the APR in the TILA disclosures.

96. As a result of Carvana's actions or inactions, they are liable to the Plaintiff for violating the Truth in Lending Act ("TILA"). As such, Plaintiff is entitled to twice the amount of the finance charge in the amount of $3566.46 in accordance with 15 U.S. Code § 1640(a)(2)(A)(i).

**WHEREFORE**, Plaintiff prays that the Court grant the following relief:

    a. That costs of this action be taxed to Defendants jointly and severally;

b. That the Court enter judgement for Plaintiff and award compensatory and punitive damages in excess of $50,000 for COUNT 1 against Carvana for fraud and forgery.

c. That the Court enter judgement for the Plaintiff awarding three times the rebate amount that was due for COUNT 2;

d. That the Court enter judgement for the Plaintiff and against Defendants awarding treble damages for COUNT 3.

e. The the Court enter judgment for the Plaintiff and against Carvana awarding twice the finance charge for COUNT 4.

f. That the Court award Plaintiff pre and post judgement interest on pre-trebled damages;

g. That the Court enter an order declaring that the Contract was voidable at the time the BMW was delivered on August 17, 2019 due to forgery by Carvana's employees or agents;

h. That the Court award any other relief it deems just and proper.

Submitted this the 14th day of January, 2022

Arthur Hill
2849 Trestle CT SW
Concord, NC 28025
Phone: 980.521.1819
Email: artbhill@hotmail.com